FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

APR 28  AM 9: 42

U.S. DISTRICT COURT.
N.D. OF ALABAMA

PHYLLIS W. SCOTT,                    ]
                                     ]
    Plaintiff(s),                ]
                                     ]
    vs.                          ]        CV-96-N-1050-NE
                                     ]
DAIKIN AMERICA, INC.,                ]
                                     ]
    Defendant(s).                ]

ENTERED

APR 2 8 1997

## Memorandum of Opinion

### I.   Introduction.

In this employment discrimination action, the plaintiff, Phyllis W. Scott, has brought claims pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), and 42 U.S.C. § 1981 against the defendant, Daikin America, Inc. ("Daikin"). Specifically, the amended complaint asserts that Daikin "unlawfully discriminated against the Plaintiff because of her race with respect to job assignments, promotions, requirements of work, and terms and conditions of employment and in retaliation for her complaining about such discriminatory actions." *Amended Complaint* at 2. This cause is presently before the court on Daikin's motion for summary judgment, filed on January 31, 1997. The motion has been briefed, and oral argument was heard at the court's March 31, 1997, motion docket. Upon due consideration, the motion will be granted.

### II.   Procedural History.

The defendant's motion for summary judgment was filed on January 31, 1997. The plaintiff's initial response was filed on February 20, 1997, but because it did not comply with



Exhibit D, the court's summary judgment scheduling order, the court struck the response in an order entered on February 25, 1997. On February 26, 1997, the plaintiff, without requesting leave of the court, filed an amended response in compliance with Exhibit D. The court entered an order on February 28, 1997, allowing the plaintiff's amended response.

On March 5, 1997, Daikin filed a motion to strike the plaintiff's amended response. While the court did not rule on the motion prior to entering this memorandum of opinion and order, the court agrees with many of the defendant's assertions in that motion. In the plaintiff's amended response, she disputes the majority of Daikin's numbered facts. Her citations to the evidentiary record that purportedly support her disputes, however, often do not do so or address matters different than those set out in the numbered fact at issue. The result is that the court has spent an inordinate amount of time discerning for itself the truly undisputed facts for the purposes of summary judgment. Furthermore, almost all of Scott's citations to the evidence are to her own affidavit, attested to on February 20, 1997, the same day she filed her initial response to the motion for summary judgment. Many portions of this affidavit, however, directly contradict sworn testimony the plaintiff gave in her deposition on July 22, 1996. Apparently Ms. Scott's affidavit was written by her counsel for the sole purpose of contradicting her earlier sworn deposition testimony.

> All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly. This concept is as old as common law jurisprudence itself. In England, the first licensed practitioners were called 'servants at law of our lord, the King' and were absolutely forbidden to 'decei[ve] or beguile the Court.' In the United States, the first Code of Ethics,

2

in 1887, included one canon providing that 'the attorney's office does not destroy . . . accountability to the Creator,' and another entitled 'Client is not the Keeper of the Attorney's Conscience.'

*Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1546 (11th Cir.), *cert. denied*, 510 U.S. 863 (1993). Whether the conduct of counsel in this matter has met this high standard of candor is a matter for him and his conscience. The court has attempted to glean for itself the undisputed facts and has used them to rule on the motion.

## III.   Statement of Facts.[1]

Daikin America, Inc. is a corporation headquartered in Orangeburg, New York and operates a manufacturing facility in Decatur, Alabama. Daikin manufactures polymer molding powders for use in various industrial applications. At all times pertinent to this action, David Naito was President of Daikin, Shin Nakagawa was Daikin's Executive Vice President, Cliff Adams was Vice President and Plant Manager, and Forrest Keith was and is Daikin's Manager of Human Resources and General Affairs. Naito's office was located in Orangeburg, while Nakagawa and Adams had offices at the Alabama plant. Keith continues to maintain an office at the plant. None of these individuals is African-American.

The plaintiff, Phyllis W. Scott, is an African-American female. She began working with Daikin through a temporary agency. Prior to selecting employees, Daikin leases workers through temporary agencies until they complete the required preemployment training and become eligible for regular employment. Keith interviewed Scott in 1993 and

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

hired her as an employee in May of that year. At that time, Daikin was in the process of establishing its Decatur, Alabama plant. The plaintiff held the receptionist position at the plant until Daikin selected her to become a human resources clerk sometime in July of 1993.[2]

Nonexempt hourly employees, such as Scott, are given performance evaluations and wage reviews every six months for the first 36 months of employment. Keith gave the plaintiff her first six-month review on November 3, 1993, which resulted in Scott receiving a merit increase.[3]  In that review, Keith gave her the highest possible rating, an "Outstanding," in the "Interpersonal Relationships" category, stating,

> Phyllis gets along well with everyone. All the other managers have commented positively on the courteousness with which Phyllis handles her responsibilities. All employees have a good relationship with Phyllis. She is extremely helpful and compassionate. She wants to see others do well and helps them succeed. Phyllis stays clear of arguments.

*Plaintiff's Affidavit* at ¶ 9. Keith gave the plaintiff her next review, which was scheduled for May 3, 1994, on April 22, 1994. He gave her the rating of "Very Good" in the category of

---

[2] The parties dispute precisely when Scott assumed the human resources clerk position. The defendant states that Scott was selected in July of 1993, while the plaintiff maintains that she "took over general administrative duties and responsibilities, including those of Human Resources Clerk" sometime in May of 1993. *Plaintiff's Affidavit* at ¶ 3. In Scott's deposition, however, she states that she began working as a human resources clerk in early July 1993. *See Plaintiff's Deposition* at 66. She cannot now use her affidavit to dispute earlier sworn deposition testimony. *See Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). Therefore, this fact is deemed admitted by the plaintiff for purposes of the motion for summary judgment. *See Exhibit D to the Court's Scheduling Order* at 4 ("All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.") (emphasis omitted) (footnote omitted).

[3] The plaintiff disputes this fact in her response to the motion for summary judgment. The court has reviewed her citation to the record, however, and has determined that her dispute is not as to whether she received a merit increase, but rather with regard to her duties during the period of review. *See Opponent's Amended Response* at ¶ 16.

4

"Interpersonal Relationships," stating, "Gets along well with other clerks. Takes initiative to enhance communication among clerks. Has helped settle some disputes between others by correcting them." *Plaintiff's Affidavit* at ¶ 10. Again, Scott received a merit increase and received a second increase effective October 30, 1994, based upon the April 22, 1994, evaluation.

On or about May 7, 1994, Daikin held a plant grand opening and open house. Scott and Bridget Rogers, another Daikin employee, worked at the reception table. Witnesses later reported to Keith that the plaintiff cursed loudly at Rogers in front of guests and Rogers's children.[4] The plaintiff denies cursing at her coworker, however. Keith conducted an investigation and interviewed each witness. None of the witnesses reported that Rogers cursed or yelled at the plaintiff.[5] In Keith's opinion, the plaintiff had indeed engaged in the conduct the witnesses reported they observed and verbally reprimanded Scott for her behavior.[6]

In June or July of 1994, while Keith and Scott were alone in Keith's office, Keith referred to Larry McCain, a black employee, as a "stupid nigger." Keith was reviewing a memorandum prepared by McCain and noted grammar and punctuation errors. The

---

[4] The plaintiff disputes this fact, citing paragraphs 13 through 16 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶¶ 20, 20a. In the plaintiff's deposition testimony, however, she admits that this incident happened and was reported to Mr. Keith. *See Plaintiff's Deposition* at 108-09.

[5] The plaintiff disputes this fact, citing paragraphs 14 through 16 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 20c. She disputes the veracity of the subject of her coworkers' reports, however, and not that they made such reports to Keith.

[6] The plaintiff disputes this fact, citing paragraphs 14 and 15 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶¶ 23, 24. In her deposition testimony, however, she stated that Keith "verbally reprimanded" her. *Plaintiff's Deposition* at 108.

plaintiff then asked Keith, "'If he is a nigger, then what am I?'" Keith responded, "'Well, I'm sorry. I shouldn't have said that, but he is.'" *Plaintiff's Deposition* at 105.

On two occasions in July and August of 1994, Scott complained to Keith regarding Daikin's hiring and initial job assignment practices. Based on information she had learned at workshops on human resources procedures, she believes that Daikin's practice of keeping data on the race and gender of job applicants is illegal, and she informed Keith of her opinion in July 1994. In August 1994, she complained to Keith regarding the initial job assignment and compensation for Charles Coleman, a job applicant who is black. She believed that Daikin had discriminated against Coleman on the basis of race by planning to assign him to a lower-paying job than whites who had scored lower in the preemployment training class. Keith then intervened to ensure that Coleman was offered the same wages as applicants with chemical industry experience, despite Coleman's lack of commensurate experience.[7]

In approximately August of 1994, Sherry Haynes and the plaintiff had a dispute regarding the proper filing procedure for confidential salary documents. Haynes reported the incident to Keith, who discussed it with Scott. When Scott complained about Haynes's behavior and attitude, Keith informed the plaintiff that resignation was among her options.

Between the April 22, 1994, performance review and the November 1994 scheduled review, Keith received numerous complaints from the other clerks about Scott's interactions

---

[7] The plaintiff disputes this fact, citing paragraphs 12, 17, and 22 through 31 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 98. These portions of her affidavit, however, do not refute this fact. Throughout this opinion the court will note plaintiff's references to her affidavit and will observe that the cited portion does not support the matter for which it is cited. In each case, no other portion of the affidavit will support the matter either.

6

with them.[8] During February or March of 1994, Keith heard the plaintiff yelling inside the supply closet. When he opened the door to the closet, he found Scott and Christine Holland inside. Holland was sobbing and reported that the plaintiff had been yelling at her.[9] Sherry Haynes reported to Keith the argument she and Scott had regarding filing procedure and stated that the plaintiff screamed and cursed at her.[10] Additionally, Joy Blankenship, a temporary employee, reported to Keith that the plaintiff had cursed at her and made her cry on one occasion.[11] Keith believes that he has never received reports in such number or severity about any employee under his supervision other than Scott.[12]

Between April and November 1994, Keith also received complaints from Daikin supervisory personnel about Scott's behavior and errors.[13] Nakagawa and Adams both informed Keith that the plaintiff talked loudly in her common work area and disturbed her fellow workers. Nakagawa also complained that the plaintiff brought documents for his

[8] The plaintiff disputes this fact but cites no evidence in support of her position. *See Opponent's Amended Response* at ¶ 25.

[9] The plaintiff disputes this fact, citing paragraph 11 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 25b. Paragraph 11, however, admits that this incident occurred; it offers the plaintiff's explanation for the incident. *See Plaintiff's Affidavit* at ¶ 11.

[10] The plaintiff disputes this fact, citing paragraphs 14 through 16 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 25d. These portions of her affidavit do not address this incident, however. In fact, in deposition testimony, she admits that the incident occurred but does not state that she cursed at Ms. Haynes. *See Plaintiff's Deposition* at 80-81.

[11] The plaintiff disputes this fact, citing paragraph 23 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 25e. This paragraph denies that the incident occurred. It does not deny, however, that Ms. Blankenship reported an alleged incident to Keith.

[12] The plaintiff disputes this fact, citing paragraphs 14 through 16 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 25f. These paragraphs do not deny, however, that this is how Keith felt about the plaintiff's alleged behavior.

[13] The plaintiff disputes the following facts, citing to paragraphs 12, 17, and 22 through 31 of her affidavit for support for her dispute. *See Opponent's Amended Response* at ¶ 26. Again, however, Scott disputes the substance of these complaints, not that the complaints were made to Keith.

7

signature that had not yet been signed by the human resources manager or the plant
manager. Greg Edmonds, Daikin's shipping and raw materials supervisor, complained to
Keith that the employee performance evaluation forms that Scott was to deliver to managers
were not provided in a timely fashion, causing delays in the evaluations of numerous
employees. Mike Ladd, the business affairs manager, relayed a complaint from accounting
supervisor Wanda Young about a payroll error the plaintiff made.

Finally, a number of individual employees complained that their health care
providers had rejected the insurance cards of their dependants.[14] Keith's investigation of
the complaints included discussions with clerk translator Hisako Butler, and Keith
determined that the plaintiff had erroneously placed the dependents' social security
numbers rather than the employees' social security numbers on the dependents' cards.
Butler asked the plaintiff several times to correct her error, but Scott continued to complete
the task incorrectly and screamed at Butler in the open area where the clerks worked.
Keith never received such complaints when other Daikin employees completed the health
insurance cards. Scott contends she completed the cards as she was trained.

In addition to the reports about Scott's performance, Keith himself observed
numerous deficiencies in the plaintiff's work. He felt she spent more time than appropriate
on telephone calls that appeared to be of a personal rather than a business nature.[15] He

---

[14] The plaintiff disputes this fact, citing paragraph 30 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 26f. This paragraph, however, does not deny that there was a problem with the manner in which Scott completed the cards.

[15] The plaintiff disputes this fact and those that follow, citing paragraph 27 of her affidavit as support for her dispute. *See Opponent's Amended Response* at ¶ 27b. The cited paragraph, however, establishes Scott's opinion that she did not spend "undue time on the telephone on personal matters." *Plaintiff's Affidavit* at ¶ 27. It does not refute Keith's stated opinion on the matter.

8

noted that she made errors in grammar, spelling, punctuation, and omitted words in the typing she did for him. She also failed to prepare appropriately for an AIDT employee training class, and she made errors completing group auto insurance identification cards. In Keith's opinion, he has never had another employee who made this many errors.

On or about November 7, 1994, Keith met with the plaintiff to discuss her performance and to communicate to her areas in which she needed to improve. At that meeting, he gave her a corrective action notice setting forth the specific deficiencies. The notice stated that the personnel files were not up to date, the plaintiff made errors on insurance identification cards, she did not follow proper procedure for reviews, she failed to complete requests for auto insurance identification cards and her AIDT duties prior to departing for a vacation, she spent an excessive amount of work time on personal telephone calls, she talked and played too much, she yelled at other employees across the open work area, she failed to complete several reports, she needed to improve her relationships with coworkers, she failed to report to work on time on October 27 and 28, 1994, and she needed to develop her computer and grammatical skills. After Keith had completed this corrective action notice, he received a complaint from Nakagawa regarding three instances in which the plaintiff failed to follow procedure in obtaining signatures for employee status forms. Keith therefore amended the corrective action notice to reflect this problem. He informed Scott at that time that if her performance did not improve by her May 1995 performance evaluation, further corrective action would be taken that might include termination of her employment.

9

On November 18, 1994, Keith gave the plaintiff her November 1994 performance evaluation. She refused to sign the form. She has since admitted that the auto insurance identification cards were not completed at the time the corrective action notice was issued. She has also admitted that she does not know if the AIDT classes were prepared on time because she gave the work to another employee, that she occasionally talked loudly in the office, and that she sometimes yelled out across the work area to other employees.[16]  She has also admitted that she failed to appear for work on October 27 and 28, 1994, and, rather than explaining her absence to Keith, she left a voice mail message informing him she would not be present those days. She further has admitted that she has had personal conflicts with other Daikin employees.

Because Keith was not satisfied with Scott's performance in the human resources clerk position and because the plaintiff had performed well in the receptionist position she formerly held, Keith decided on November 21, 1994, to return her to her former position.[17] Bridget Rogers, a white employee who held the receptionist position at that time, assumed the plaintiff's duties as human resources clerk. Adams approved the decision to transfer the plaintiff to the receptionist position, and David Naito and Nakagawa did not veto the decision. The plaintiff's wages were unaffected by the change in position.

_____

[16] The plaintiff has disputed these admissions, citing paragraphs 12, 17, and 22 through 31 of her affidavit as support for her dispute. These admissions were made in her deposition, however, and she cannot now change her prior sworn testimony through her affidavit. *See Van T. Junkins*, 736 F.2d at 687-88.

[17] The plaintiff disputes this fact, citing paragraphs 12, 17, and 22 through 31 of her deposition as support for her dispute. These paragraphs, however, do not support her contention.

10

Following the corrective action in November 1994, neither Keith nor Adams observed improvement in Scott's performance, and Keith continued to receive reports of performance problems from others. On January 9, 1995, Mike Ladd, Daikin's business affairs manager, and Keith held a meeting with the plaintiff to discuss her performance. Keith gave the plaintiff a second corrective action notice. At that time, Scott submitted to Keith a written response to her November 1994 corrective action notice.[18] The response did not mention race discrimination or retaliation.

Keith did not observe any improvement in the plaintiff's performance after January 9, 1995. During this period, he received complaints from Adams and others concerning the rude manner in which the plaintiff often greeted guests and answered the telephone. Scott also repeatedly overstated the time on her time card for the two week period ending February 18, 1995, and Keith is aware of no other Daikin employee who overstated his or her time as frequently and severely as did the plaintiff.[19]

Based on Scott's continued poor performance, her inability to get along well with coworkers, and her repeated examples of undependability and inaccuracy, Keith decided

---

[18] The parties dispute whether Scott attempted to give this written response to Keith on any prior occasions. Scott asserts that Keith refused to accept the response several times. *Plaintiff's Affidavit* at ¶ 29.

[19] Keith contends in his affidavit that the accounting department investigated Wendell Parker's overstatement of his time, and the investigation revealed that Mr. Parker overstated his time by one hour on one day and by 1/2 hour in another day during the same week. Mr. Parker was reprimanded for his conduct in Keith's presence. *Keith Affidavit* at ¶¶ 44a, 44b. The plaintiff disputes the number of hours by which Parker overstated his time. She contends that Wanda Young, the accounting supervisor, told her he had overstated his time by ten hours. *Plaintiff's Deposition* at 119.

Daikin required that Marcus McCain, a white employee, repay an overpayment that occurred during the same week it was made. There was no record of repeated overstatement of time in Mr. McCain's case. Paul Elliot, an African-American employee, was paid for both short term disability and workers compensation during the same period in the fall of 1993. He was not required, however, to repay the double payment even though the short term disability policy compels a reduction of benefits by the amount of workers compensation received during the same period. Daikin took no disciplinary action against Mr. Elliot.

to terminate her employment.[20] Adams approved the decision, and he notified Naito and Nakagawa. Both Naito and Nakagawa had the authority to veto the decision, but neither did so. On February 21, 1995, Adams and Keith met with the plaintiff to inform her that her employment with Daikin was terminated because of continued poor work performance, her inability to get along with others, and her repeated examples of undependability and inaccuracy.

On or about March 19, 1995, after the plaintiff's termination, the Equal Employment Opportunity Commission ("EEOC") received from the plaintiff a completed intake questionnaire. She filed an amended charge with the EEOC on or about October 19, 1995, alleging race discrimination as a result of her November 21, 1994, transfer from human resources clerk to receptionist and her February 21, 1995, termination.[21] The EEOC issued Scott a right to sue letter on January 19, 1996, and she filed this action on April 18, 1996.

Scott testified in deposition that she believes she was terminated because of her race based upon the "face-to-face confrontations [she] had with Forrest Keith . . . [, her] life experiences working for the company . . . and the comparison between how [Daikin] . . . treated the blacks as opposed to the whites." *Plaintiff's Deposition* at 38. She further stated that Keith "falsified and created a paper trail to justify terminating" her. *Id.*

With regard to the face-to-face confrontations, Scott gave examples in her deposition testimony: (1) Keith did not mention her poor performance before the November 7, 1994,

---

[20] The plaintiff disputes this fact, citing paragraphs 12, 17, and 22 through 31 of her affidavit as support for her dispute. In her deposition testimony, however, Scott admits that these were Keith's stated reasons for her termination, *see Plaintiff's Deposition* at 233, and cannot now use her affidavit to contradict sworn testimony.

[21] The amended charge was dated on November 9, 1995, by the plaintiff.

12

corrective action notice;[22] (2) the plaintiff told Keith it was illegal for Daikin to keep race and gender data on job applicants and eventual hires; (3) she complained to Keith about Charles Coleman's initial placement; (4) Keith orally reprimanded Scott for arguing with Sherry Haynes over filing procedure and suggested that resignation was among Scott's alternatives; (5) after Keith transferred the plaintiff to the receptionist position, he occasionally used temporary employees to fill in if Scott was absent and, upon her return, asked her to work for other clerks in the department; (6) Keith told her she could not respond to the November 1994 corrective action notice; and (7) the plaintiff was terminated before she was allowed to talk to David Naito about her situation.

Scott also gave examples of the "life experiences" which she believes demonstrate Daikin's racial discrimination: (1) an instance in the summer of 1994 in which Keith used the word "nigger" to refer to another African-American employee; and (2) Keith verbally reprimanded the plaintiff for the incident involving Bridget Rogers at the open house.

She gave examples in her deposition testimony of how, in her opinion, Daikin treated blacks in comparison with the company's treatment of whites: (1) Wendell Parker, a white employee, allegedly overstated his time by ten hours yet was not terminated for such action;[23] (2) the fact that Daikin kept records of the race and gender of all interviewees and

---

[22] Scott makes this allegation even though she conceded in her deposition testimony that prior to November 1994, Keith addressed with her the incident at the open house involving Bridget Rogers. *See Plaintiff's Deposition* at 131.

[23] The plaintiff testified in deposition that she learned of this alleged incident through Wanda Young, the accounting supervisor. *Plaintiff's Deposition* at 119.

allegedly determined, based upon this information, how many blacks they needed to hire;[24] and (3) white employees allegedly received larger wage increases than blacks during performance reviews.[25]

Finally, in Scott's deposition testimony, she gave examples of facts that, in her opinion, demonstrate Keith created a paper trail falsifying her performance to justify her termination: (1) prior to November 8, 1994, Keith never indicated that her performance was anything other than acceptable;[26] (2) her performance reviews until that issued in November 1994 indicated she was performing satisfactorily; (3) Scott believes that Keith wanted to replace her in the human resources clerk position with Bridget Rogers; and (4) after Keith gave the plaintiff the November 1994 corrective action notice, Scott requested a meeting with the coworkers with whom Keith stated she could not get along, but Keith refused, stating that the other clerks did not wish to have such a confrontation.

The plaintiff was never told she was being terminated because of her race, and she heard Keith use a racial slur only once, as discussed previously. She has never heard Naito

---

[24] Keith has stated he believed that all companies who contract with the federal government or their contractors were required to keep such information and to complete an EEO-1 form. *See Keith Affidavit* at ¶¶ 61, 62.

[25] Scott admitted in her deposition testimony that she never did an analysis which compared wages and race, nor did she supervise any of the individuals she named as examples of victims of discriminatory wage practice. *Plaintiff's Deposition* at 124.

[26] Again, the court notes, however, that in her deposition testimony, Scott admits that Keith verbally reprimanded her regarding the open house incident with Ms. Rogers.

or Adams use a derogatory racial term. Keith took action against the only white employee he believed to have used racial slurs with regard to African-Americans in the workplace.[27]

The plaintiff believes she was terminated in retaliation for not signing her performance appraisal and because she complained to Adams regarding her transfer from human resources clerk to receptionist. No Daikin employee told Scott that either of these events was the basis for her termination.[28]

Scott stated in her deposition testimony that she does not know what is meant by her amended complaint's claim of discrimination based upon "terms and conditions" of employment and never mentioned such a claim in her EEOC charge. She never sought a promotion and never mentioned any promotion claim in her EEOC charge. She has not been replaced by a Daikin employee since her termination; rather, a series of temporary service employees have performed the receptionist function. Keith asserts that he did not consider any race discrimination complaint of the plaintiff's in making the decision to transfer her to the receptionist position and later to terminate her employment.

## IV.   **Standard of Review.**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[27] The plaintiff disputes this fact, citing paragraph 17 of her affidavit as support for her dispute. This paragraph does not address the incident in question, however, nor does any other portion of her affidavit.

[28] The plaintiff disputes this fact, citing paragraphs 12, 17, and 22 through 31 of her affidavit as support for her dispute. In her deposition testimony, however, she states that these reasons are the basis for her retaliation claim, and she cannot now use her affidavit to contradict her sworn deposition testimony.

15

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

16

After the plaintiff has properly responded to a proper motion for summary judgment,
the court must grant the motion if there is no genuine issue of material fact, and the moving
party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law
will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's
function is not himself to weigh the evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same
standard necessary to direct a verdict: "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so one-sided that one party
must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v.
NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is
"[s]ubstantively . . . very close" to that for motions for directed verdict). However, the
nonmoving party "must do more than simply show that there is some metaphysical doubt
as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.
574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative,
summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted);
*accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must
"view the evidence presented through the prism of the substantive evidentiary burden," so
there must be sufficient evidence on which the jury could reasonably find for the plaintiff.
*Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir.
1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing

17

of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## V.   **Discussion.**

The plaintiff has asserted race discrimination and retaliation claims pursuant to both Title VII and section 1981. A plaintiff who alleges disparate treatment based upon race under Title VII must prove that the defendant acted with discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Likewise, section 1981 requires proof of discriminatory intent. *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 583 n. 16 (1984).

The plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989).   A plaintiff may establish a prima facie case in three ways: (1) "by presenting direct evidence of discriminatory intent; [(2)] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973); or [(3)] by demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (Title VII case); *see also Ramirez v. Sloss*, 615 F.2d 163,

18

168-69 (5th Cir. 1980) (applying *McDonnell Douglas* burden-shifting analysis to section
1981 claim).

## A.   Direct Evidence.

"Direct evidence of discrimination would be evidence which, if believed, would
prove the existence of a fact without inference or presumption." *Carter v. City of Miami*,
870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks,
whose intent could be nothing more than to discriminate . . . constitute direct evidence of
discrimination." *Id.* at 582 (footnote omitted).

The only allegation of direct evidence of racial discrimination in this action concerns
the racial slur Keith used in Scott's presence with regard to Larry McCain, an African-
American employee. After this incident occurred, however, Keith disciplined a white
employee who used similar racial slurs. This evidence is not "blatant" enough such that
the only inference one could make is that Keith felt similarly about the plaintiff and
transferred her from the human resources clerk position to the receptionist position,
refused to promote her, discriminated against her with regard to the terms and conditions
of her employment or requirements of work, or terminated her employment as a result.
Likewise, no one at Daikin ever made any comment in regard to the employment actions
at issue here that would constitute direct evidence of racial discrimination. Accordingly,
Scott must attempt to make out a prima facie case through statistical or circumstantial
evidence.

## B.   Statistical Evidence.

19

A second means by which Scott may show a prima facie case is by presenting statistical evidence that demonstrates a pattern and practice of race discrimination. *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (age discrimination case). The plaintiff has presented no statistical data; therefore, she must attempt to establish a prima facie case of discrimination through circumstantial evidence.

## C.   *McDonnell Douglas* Test.

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[29]  "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.* "'[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted.'" *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

---

[29] Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas-Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

20

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "'[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment.'" *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). The plaintiff may prove that the defendant intentionally discriminated against him "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "'Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, ___, No. 95-6922, 1997 WL 70608, at *8 (11th Cir. Feb. 20, 1997).

21

1.   **Claims of Discrimination Based Upon Promotions, Requirements of Work, and Terms and Conditions of Employment.**

   a.   **Title VII.**

The plaintiff's amended complaint states that Daikin "unlawfully discriminated against the Plaintiff because of her race with respect to job assignments, promotions, requirements of work, and terms and conditions of employment and in retaliation for her complaining about such discriminatory actions." *Amended Complaint* at 2. Scott's amended EEOC charge, however, references instances of discrimination with respect only to her job assignments and retaliation. It does not mention promotions, requirements of work, or terms and conditions of employment.

The scope of litigation under Title VII is necessarily circumscribed by the charge of discrimination that was filed with the EEOC.

> [The judicial complaint] 'may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission.' . . . In other words, the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970) (quoting *King v. Georgia Power Co.*, 295 F. Supp. 943, 947 (N.D. Ga. 1968)). The EEOC charge, initiated as it is by a layman, must be read with the utmost liberality to effectuate the purposes of the Civil Rights Act. *Tillman v. City of Boaz*, 548 F.2d 592, 593 (5th Cir. 1977). The court may not, however, read the requirement of an EEOC filing out of the statute. A judicial complaint is "like or related" to the EEOC charge if it was within the scope of investigation conducted

22

by the EEOC. A "Title VII suit [may] . . . extend as far as, but no further than, the scope of the EEOC investigation which could reasonably grow out of the administrative charge." *Terrell v. U.S. Pipe & Foundry Co.*, 644 F.2d 1112, 1123 (5th Cir. Unit B 1981).

The plaintiff's complaint contains allegations she did not make to the EEOC; therefore, she is precluded from bringing them here. Accordingly, the motion for summary judgment will be granted with respect to the Title VII promotions, requirements of work, and terms and conditions of employment claims, and these claims will be dismissed with prejudice. These claims made pursuant to section 1981, however, remain viable.

### b.    Section 1981.

Scott cannot make out a prima facie case of race discrimination with respect to promotions, work requirements, or terms and conditions of employment pursuant to section 1981 because she makes no factual allegations pertaining to these claims other than the conclusory statement contained in her amended complaint. *See Amended Complaint* at 2. In fact, Scott admitted in her deposition testimony that she is unaware of the meaning of the phrase "terms and conditions of employment." Moreover, at no time does she allege she was denied a promotion or promotion opportunity, nor does she aver that her work requirements or terms and conditions of employment were any different than those of other Daikin employees or discriminatory in any manner. Accordingly, the summary judgment motion to the extent it addresses Scott's section 1981 claims of discrimination with respect to promotions, work requirements, and terms and conditions of employment will be granted and these claims dismissed with prejudice.

### 2.    Claim of Discrimination in Job Assignments.

23

Scott claims that she was discriminated against based upon her race with respect to her job assignments. The court understands this claim to involve Keith's decision to transfer her from the human resources clerk position to receptionist in November 1994. To establish a prima facie case of race discrimination with regard to this claim, the plaintiff must demonstrate that (1) she is a member of a racial minority; (2) she was qualified for her job; (3) she was transferred from her job; and (4) she was replaced with a person outside the racial minority. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973) (four-part test is: (1) belongs to racial minority; (2) applied for and qualified for job for which employer was seeking applicants; (3) rejected for job; and (4) position remained open and employer continued to seek applicants of similar qualifications).[30] The test for establishing a prima facie case of discriminatory transfer for misconduct is: (1) the plaintiff belongs to a protected class; (2) she was qualified for her position; (3) she was transferred from that position; and (4) the misconduct for which she was transferred was nearly identical to that engaged in by a white employee who was not transferred. *Oliver v. Russell Corp.,* 874 F. Supp. 367, 372-73 (M.D. Ala. 1994).

Scott meets the first and third prongs of both tests in that she is African-American and was transferred from her position as human resources clerk. Furthermore, she was replaced by Bridget Rogers, a white employee. Additionally, there is a genuine issue of fact as to Daikin's treatment of Cathy Burrough and Deborah Howard, two white

---

[30] The court notes that the *McDonnell Douglas-Burdine* test is not meant to be applied mechanically. *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir. 1980). Rather, the test is designed to be flexibly adapted to various factual allegations. *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 594 (11th Cir. 1987).

24

employees, and whether their job transfers were voluntary or involuntary. It is undisputed, however, that Scott was transferred because she was no longer qualified for the human resources clerk position due to extensively documented performance problems. Keith himself observed the deficiencies and received numerous reports of problems from other Daikin employees. Scott, however, asserts that her performance was satisfactory but offers no evidence of that fact other than her affidavit and thus does not meet this prong of either test. Accordingly, she cannot establish one of the four prongs of either *McDonnell Douglas* test, and the defendant's motion for summary judgment with regard to the discriminatory job assignments claim is therefore due to be granted.

Assuming, *arguendo*, that Scott does make out a prima facie case, however, the motion must still be granted. Upon the plaintiff's showing of a prima facie case, the burden shifts to Daikin to present a legitimate, nondiscriminatory reason for transferring her from the human resources clerk position to the receptionist position. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The facts undisputedly demonstrate that Keith told Scott verbally and in writing that the reason she was being transferred to the receptionist position was her continued poor performance as human resources clerk. She had previously performed satisfactorily as receptionist, and Keith wished to give her the opportunity to do so again.

Daikin has met its burden; consequently, the burden shifts back to Scott to prove by a preponderance of the evidence that Daikin's stated reason for her transfer is a mere pretext for discrimination and that the defendant intentionally discriminated against her through such action. *McDonnell Douglas*, 411 U.S. at 804. Scott, however, presents no

25

evidence of discriminatory transfer other than her own affidavit. Mere conclusory allegations of discrimination are insufficient to meet her burden. *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996). Accordingly, the defendant's motion for summary judgment as it pertains to the discriminatory job assignments claim will be granted and the claim dismissed with prejudice.

### 3.    **Claim of Retaliatory and Racially Motivated Discharge.**

Scott claims that Daikin terminated her employment in retaliation for her refusal to sign her November 1994 performance review and for her complaints to Keith about some of Daikin's employment practices she believes are discriminatory. Title VII protects employees from discrimination by employers because the employee has opposed any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). A plaintiff need not prove the actual existence of those unlawful employment practices; rather, he need only have a reasonable belief that the defendant engaged in such practices. *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 1000 (1982).

In order to make out a prima facie case of retaliatory discharge, Scott must show that (1) she was engaged in statutorily protected expression, (2) Daikin took adverse employment action against her, and (3) there was a causal link between the protected expression and the adverse action. *Lindsey v. Mississippi Research and Dev. Ctr.*, 652 F.2d 488, 491 (5th Cir. Unit A 1981). Once a prima facie case is established, the defendant must articulate some legitimate, nondiscriminatory reason for the plaintiff's termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts back

26

to the plaintiff to prove by a preponderance of the evidence that this reason is merely a pretext for discrimination. *Id.* at 804.

In the Eleventh Circuit, "statutorily protected expression" includes filing an EEOC charge, 42 U.S.C. § 2000e-3(a), formal and informal complaints to an employer, *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989), written protests, *Smalley v. City of Eatonville*, 640 F.2d 765 (5th Cir. Unit B 1981), and warnings from employers not to complain about alleged discriminatory practices, *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992). At the time of Scott's termination, she had not yet filed a charge with the EEOC, but she had complained to Keith regarding her belief that some of Daikin's hiring practices were discriminatory. Accordingly, she has demonstrated that she engaged in statutorily protected expression as that phrase is defined by the Eleventh Circuit.

Daikin took adverse employment action against her in that the company terminated her. It is possible that her transfer from human resources clerk to receptionist could be construed as an adverse action as well, although she did not receive a decrease in wages as a result. In any event, Scott has met the second prong of the retaliatory discharge test and must therefore point to evidence that there was a causal link between her complaints to Keith and her subsequent transfer or termination. This is where she fails in her burden.

"Evidence that the protected activity and the adverse employment action were not totally unrelated satisfies the third prong . . . ." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981 (1985). The plaintiff must prove she was transferred or terminated "because of" her opposition to unlawful employment

27

practices. *Smalley v. City of Eatonville*, 640 F.2d 765, 769 (5th Cir. Unit B 1981). She concedes in her deposition testimony, however, the majority of the performance problems that Keith cites as the basis for his transfer and termination decisions. Furthermore, Scott offers no evidence other than her own stated belief that these decisions were instead made because of her complaints to Keith or any other Daikin employee or the fact that she refused to sign her November 1994 performance review. She therefore cannot make out a prima facie case of retaliatory discharge, and the motion for summary judgment with regard to the retaliatory discharge claim is due to be granted.

Assuming, *arguendo*, that the plaintiff can establish a prima facie case of retaliatory discharge, however, the summary judgment motion as it relates to this claim must still be granted because she cannot raise a genuine issue of material fact regarding Daikin's articulated reason for its actions. As Daikin did with regard to the claim of discriminatory transfer, it has demonstrated that it had legitimate, nondiscriminatory reasons for terminating the plaintiff, for it is undisputed that documented unsatisfactory work performance was the stated reason Keith both transferred and eventually terminated Scott.

Therefore, the burden shifts back to the plaintiff to point to evidence that raises a genuine issue of material fact regarding whether the defendant's proffered reasons were mere pretext for discrimination and from which the fact finder could infer that the defendant intentionally discriminated against the plaintiff. *McDonnell Douglas*, 411 U.S. at 804. Scott, however, points to no evidence other than her own affidavit of retaliation pretext. The assertion she made in her deposition testimony that Daikin treated Wendell Parker differently than it did the plaintiff with regard to the overstatement of time issue is

28

unfounded. She bases this contention on inadmissible hearsay and has no independent knowledge of the incident. Again, the court observes that conclusory allegations of discrimination are insufficient to meet the plaintiff's burden. *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996). Accordingly, the defendant's motion for summary judgment as it pertains to the retaliatory discharge claim will be granted and the claim dismissed with prejudice.

As she cannot raise a genuine issue regarding the defendant's articulated reason for her discharge, she also cannot do on any claim of a racially motivated discharge claim.

## VI. Conclusion.

The court has decided the summary judgment motion based upon its merits and therefore will not address the defendant's procedural arguments. *See Movant's Initial Submission* at 23-24.

The motion for summary judgment will be granted and all claims dismissed with prejudice. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this __27th__ of April, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

29